Glass Door Liquor License Case.

Argued September 20, 1960. Before Rhodes, P. J., Gunther, Wright, Woodside, Ervin, Watkins, and Montgomery, JJ.

*Russell C. Wismer,* Special Assistant Attorney General, with him *George G. Lindsay* and *Horace A. Segelbaum,* Assistant Attorneys General, and *Anne X. Alpern,* Attorney General, for Pennsylvania Liquor Control Board, appellant.

*Samuel Kagle,* for appellee.

OPINION BY WOODSIDE, J., November 16, 1960:

This appeal was taken by the Pennsylvania Liquor Control Board from an order of the Court of Quarter Sessions of Philadelphia reversing the board's order which revoked the restaurant liquor license of Manber Corporation.

The board found that "The licensee, by its servants, agents or employes permitted entertainers to contact and/or associate with patrons on the licensed premises, on May 29 and 30, 1957." The appellee had a record of previous citations and suspensions.

A Philadelphia police officer testified before the board as follows: "On Wednesday May 29, 1957, about 12:30 a.m., I entered the Black Cat Cafe, as it was known, and was seated at the bar and ordered a drink. At this time, a show was going on and a girl by the name of Sandra was performing. After she finished she came down and sat alongside of me and said, 'hello honey, how are you doing?' I said, all right. She said, 'We could have a good time together.' I said that would be all right by me, where would we go. She said the Gladstone Hotel. She left me then and went and sat with someone else. At that time, Felix, the bartender, known to me as Phil—he had introduced himself before that—came over and said he would introduce me to something nice. He introduced me to Doris, a light skinned colored girl, also an entertainer. I sat there with her and she said, 'what is the matter honey, I don't believe you want me, I think you want Sandra.' I left the bar at that time.

"On Wednesday night, May 29, 1957, the same date, but in the evening, about 10:30 p.m. I entered the Black Cat again. I took a position at the bar and ordered a drink. At that time, Sandra came over and said she was sorry she had left me the night before, but said we could still have a good time together. I

said, that will be all right by me. I asked where and she said the Gladstone Hotel. She said, stay around until closing time. I said I could not stay until. closing time and she said come back about 1:30 a.m. I left and about 2:20 a.m. the following morning, which would be May 30, I re-entered and Sandra came over and took a seat beside me and said we can have a good time now. She said, you go to the hotel—I will write the hotel down on a piece of paper and I will give you the 'phone number of this place and when you get to the hotel and get a room, you call me. I went to the Gladstone Hotel and registered in room 29B. . . . I registered and got room 29B and made a telephone call to the number she gave me. A female voice answered and identified herself as Sandra. I said I had room 29B and she said, stay there. I waited until 4:15 a.m. when a knock came on the door and Sandra entered. She said, 'now we are alone, we can have a good time together.' I said, that is all right and she said, what is the matter, might it be the money? I said maybe. She said would fifty dollars be all right and I said, yes. I gave her fifty dollars and asked what I was going to get for the fifty dollars and she said, we are going to have a good time. She disrobed down to her panties and I identified myself and placed her under arrest."

The president of the corporate licensee testified that he did not require, request or permit entertainers to contact or associate with patrons, and that he posted the board's regulations where the entertainers would see them.

The parties agreed that the testimony taken before the board should be admitted into evidence at the hearing before the court of quarter sessions. The president of the corporate licensee appeared before the court and said the licensed establishment was remod-

eled, no longer had entertainment, and now concentrated on good food. The bartender testified that he had no recollection of the visit of the officer and that he never saw an entertainer talk to a patron in the licensed establishment.

In its opinion the court stated, inter alia, that "On May 29, 1957, Philadelphia Police Officer Edward J. Cahill, . . . went to defendant's night club and seated himself at the bar. He ordered a drink and thereafter, he met and had a short conversation with a female entertainer named 'Sandra.' " The trial judge was impressed with the appellee's evidence and concluded that the defendant did not *knowingly and openly* permit entertainers to contact and associate with customers at the night club's premises." The court thereupon reversed the board.

Under the authority given the board by section 207(i) of the Liquor Code of April 12, 1951, P. L. 90, 47 P.S. §2-207(i), it adopted the following regulation:

"Section 110.02

". . . D. No licensee shall require, request or permit any person engaged directly or indirectly as an entertainer in the licensed establishment or in any room or place connected therewith, to contact or associate with the patrons in such establishment, room or place for any purpose whatsoever. (A copy hereof shall be constantly and conspicuously displayed on the wall of the dressing room or rooms used by such entertainers.)"

The evidence establishes that this provision was violated. The court's conclusion that the appellee's "business privilege should not be forfeited and his investment sacrificed upon such proof as presented here," is without merit, and as contrary to the credible evidence taken before the board and admitted into the court record.

The appellee argues that the evidence does not establish that the licensee "permitted" an entertainer to contact and associate with the patrons. The licensee "permitted" association if it acquiesced by failing to prevent the entertainers from associating with patrons. See definition of "permit". Black's Law Dictionary (4th Edition) p. 1298. See *Commonwealth v. Koczwara*, 188 Pa. Superior Ct. 153, 146 A. 2d 306; 397 Pa. 575, 155 A. 825 (1959).

As stated by Mr. Justice COHEN: "Because of the peculiar nature of this business, one who applies for and receives permission from the Commonwealth to carry on the liquor trade assumes the highest degree of responsibility to his fellow citizens. As the licensee of the Board, he is under a duty not only to regulate his own personal conduct in a manner consistent with the permit he has received, but also to control the acts and conduct of any employee to whom he entrusts the sale of liquor. Such fealty is the *quid pro quo* which the Commonwealth demands in return for the privilege of entering the highly restricted and, what is more important, the highly *dangerous* business of selling intoxicating liquor." *Commonwealth v. Koczwara*, 397 Pa. 575, 581, 155 A. 2d 825 (1959). See also *Easton's Liquor License Case*, 142 Pa. Superior Ct. 49, 50, 15 A. 2d 480 (1940). This rule applies not only to the bartenders and waitresses but also to the entertainers.

The evidence establishes the violation. "The court of quarter sessions cannot capriciously disregard competent evidence of violations presented in a hearing," nor does it have "discretionary power to act in an arbitrary manner." *Janiro Liquor License Case*, 163 Pa. Superior Ct. 398, 402, 62 A. 2d 102 (1948).

The order of the court is reversed and the order of the board reinstated.